**IN THE UNITED STATES COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

DAVID HUGHES,             )
                                  )
          Plaintiff,            )
                                  )
         v.                     )         Case No. 04-4053-CV-C-NKL
                                  )
ROGER D. STOTTLEMYRE,    )
JAMES RIPLEY,             )
ERIC WILHOIT, and         )
VINCENT ELLIS             )
                                  )
         Defendants.        )

## ORDER

Pending before the Court is Defendants' Roger D. Stottlemyre ("Stottlemyre"), James Ripley ("Ripley"), Eric Wilhoit ("Wilhoit"), and Vincent Ellis ("Ellis") (collectively "Defendants") Motion for Summary Judgment [Doc. # 44]. For the reasons set forth below, the Court grants Defendants' Motion.

Also pending before the Court is Stottlemyre's individual Motion for Summary Judgment [Doc. 42]. Because the Court grants the Defendants' pending Motion, it will deny Stottlemyre's individual Motion as moot.

Also pending before the Court is Plaintiff David Hughes's ("Hughes") Motion to Strike [Doc. # 49]. Because the Court grants the Defendants' pending Motion without relying on those portions of the record that Hughes seeks to strike, the Court will deny Hughes's Motion as moot.

1

Also pending is Hughes's recent motion to amend his Complaint [Doc. 67]. Because that motion is untimely, it will be denied. Furthermore, it is futile because the record does not support a submissible claim based on the amendment.

## I.      Background

### A.      The Parties

Hughes was a sergeant in the Missouri Highway Patrol ("the Patrol") and he was the Zone Sergeant that supervised the Patrol's activities in Bates County, Missouri. Bates County is located within the jurisdiction of Troop A of the Patrol. Hughes was eventually demoted from his sergeant position and reassigned to the Gaming Division of the Patrol. Hughes still works for the Patrol as a trooper in the Gaming Division.

Ripley was a lieutenant in the Patrol and he directly supervised Hughes while Hughes was employed as a sergeant. Ellis was Commander of Troop A and he supervised both Ripley and Hughes. Stottlemyre was Superintendent of the Patrol and its highest ranking officer; Stottlemyre did not directly supervise Hughes. Wilhoit was an investigator in the Professional Standards Division of the Patrol and he did not supervise Hughes.

### B.      The Protected Activity

Hughes was promoted to his Sergeant position in 1997. In his role as the Sergeant that oversaw Bates County, Hughes supervised numerous troopers, including Troopers Mark Pate ("Pate"), R.B. Arnold ("Arnold"), and B.D. Mullenix ("Mullenix"). Hughes also supervised Corporal Kevin Fisher ("Fisher").

2

In June 2003, Ripley notified Hughes about an upcoming meeting regarding consolidating Patrol zones in Bates County and Cass County. Cass County is also within the jurisdiction of Troop A. Before the meeting, Hughes gathered accident statistics for both Bates and Cass Counties, as well as accident statistics for another neighboring county.

Ellis, Ripley, and Hughes attended the meeting a few days later in June 2003. Ellis announced the plan to consolidate because of a manpower shortage in Cass County. Hughes objected to Ellis's consolidation plan because he believed the troopers would be trying to cover too much ground and that the consolidation would be a disservice to the citizens of Bates County. Hughes presented some accident statistics from Bates County that he collected in anticipation of the meeting and expressed his concern about the adverse consequences of the consolidation on Bates County. As an alternative to the consolidation plan, Hughes suggested that Mullenix be re-assigned from Bates County to Cass County because Mullenix was the least productive trooper in Hughes's zone. Hughes also suggested that a trooper from a neighboring county also be re-assigned to Cass County. Ellis adopted Hughes's suggestion in part and decided to re-assign Arnold (a trooper from Hughes's zone) to Cass County for the summer of 2003 instead of going forward with the consolidation plan. At the conclusion of the meeting, Ripley was visibly angry at Hughes.

In September 2003, Ripley and Hughes again discussed the consolidation issue. Ripley told Hughes, "I thought we were together on this" and he was displeased that Hughes had suggested an alternative to the consolidation plan during the June 2003 meeting. Hughes expressed to Ripley that he believed the consolidation plan would spread troopers

3

too thin between the two counties and that it would have a negative impact on the Patrol's activities in Bates County.

In October 2003, the Patrol implemented the consolidation plan.

**C.      The Adverse Employment Action**

After he spoke out against the consolidation plan, Hughes alleges that Ripley and Ellis undertook a systematic plan to retaliate against him. Hughes also alleges that Wilhoit, in his capacity as an investigator for the Patrol, also engaged in the plan to retaliate against him for opposing the consolidation plan.

In his brief, Hughes alleges over thirty incidents that he believes constitute adverse employment actions. Below is an overview of the more substantial alleged adverse employment actions alleged by Hughes.

*1.      Employment Evaluations*

**a.      Hughes's Evaluations**

Hughes alleges that his employment evaluations reflect a retaliatory animus because they were more negative after his protected activity.

In October 2001, Ripley evaluated Hughes's performance and Ellis signed the evaluation. Ripley concluded that Hughes's performance fell between the ranges of "Meets Expectations" and "Excels" in all of the categories, which included Appearance, Communication Skills, Decision Making / Judgment, Management Techniques, Leadership, Interpersonal Skills, Dependability, and Supervision Skills. Hughes's October 2001 evaluation contained primarily positive comments regarding his conduct as a sergeant.

4

In October 2002, Ripley again evaluated Hughes and Ellis signed the evaluation. Again, Ripley concluded that Hughes's performance fell between "Meets Expectations" and "Excels" in all of the same categories as those in the October 2001 evaluation. The October 2002 evaluation was generally positive, although it contained more negative comments than Hughes's October 2001 evaluation, particularly regarding Hughes's interpersonal skills. Ripley also noted, "Sergeant Hughes has become almost consumed with the notion that he is going to be transferred to another division of the patrol."

In October 2003, and after Hughes's protected activity, Ripley again evaluated Hughes and Ellis signed the evaluation. Ripley concluded that Hughes's performance fell between "Meets Expectations" and "Excels" in all of the same categories that were listed in Hughes's October 2001 evaluation. Although Hughes's evaluation was generally positive, there were more negative comments directed to specific incidents where Ripley felt that Hughes had performed inadequately as a sergeant. While discussing this evaluation, Ripley warned Hughes that he might face a demotion because of his conduct.

Hughes appealed the October 2003 evaluation to Ellis and challenged virtually every comment contained in it. Ellis rejected the appeal because he did not view the evaluation as a negative sanction of Hughes's conduct. Instead, Ellis recommended that "[i]t should serve as a guideline for you to improve in your job performance." Ellis also offered to meet with Hughes regarding the evaluation, but they never met to discuss it. Hughes alleges that his October 2003 evaluation was an adverse employment action that was retaliatory in nature.

### b. Subordinates Evaluating Sergeants

In November 2003, Ripley instituted a new policy where corporals and troopers would evaluate their supervising sergeants. Hughes alleges that Ripley ignored and discounted the negative comments directed at Sergeant Davidson, who was also under Ripley's supervision. In his brief, Hughes outlines a series of negative comments that were directed at Davidson by his subordinates and alleges that Ripley took no action regarding these negative comments.

Hughes's evaluations by his subordinates also had a series of negative comments. Although Hughes's argument is unclear, it appears that he is arguing Ripley discounted negative comments against one sergeant, but then relied on the negative comments about Hughes to instigate disciplinary proceedings against him. Thus, it appears Hughes is arguing that Ripley has failed to treat similarly situated employees in the same fashion, thereby demonstrating Ripley's alleged retaliatory animus.

## 2.      *Three Disciplinary Complaints Signed By Ripley*

In early 2004, Ripley signed three disciplinary complaints against Hughes that alleged that Hughes violated Patrol policies. Although the incidents occurred prior to early 2004, there is no evidence that Ripley had knowledge of Hughes's conduct prior to early 2004. Additionally, the undisputed evidence reflects that the complaints were initiated by Fisher, a corporal that Hughes supervised, and that Defendants did not solicit or seek out the information contained in Fisher's complaints.

According to Patrol policy, when a subordinate officer submits a complaint about a superior officer, then the supervising officer who oversees the superior officer that is the

6

subject of the complaint must sign the disciplinary complaint and submit it to the

Professional Standards Division of the Patrol for an inquiry. Thus, when Fisher approached

Ripley about his complaints against Hughes, Patrol policy dictated that Ripley had to sign

the formal disciplinary complaints against Hughes in his capacity as Hughes's supervising

officer--not as the individual who was the catalyst for the complaint.

Wilhoit investigated all of the complaints against Hughes in his role as an

investigator with the Professional Standards Division of the Patrol. The evidence reflects

that Wilhoit was assigned to investigate the complaints against Hughes by his supervisor.

### a.     Shooting Incident

On January 14, 2004, Ripley signed a complaint against Hughes with the

Professional Standards Division of the Patrol for an incident that occurred in December

2003. On December 13, 2003, which was a Saturday, Mullenix fired his rifle across a

Missouri highway to shoot a coyote and then trespassed on private property to recover the

coyote. When Hughes learned about the incident the following Monday from Mullenix, he

did not immediately notify Ripley. Instead, Hughes instructed Fisher to tell Ripley about

the incident during a meeting that Fisher had scheduled on Tuesday with Ripley. Hughes

also instructed Fisher not to report all of the details to Ripley and to tell Ripley that

employees of the Missouri Department of Transportation ("MODOT") had instigated the

complaint against Mullenix, which was not true. Additionally, Hughes advised Mullenix not

to discuss the incident with the Patrol without the representation of an attorney during the

ensuing investigation.

Wilhoit conducted an investigation of Hughes's conduct. In a report dated March 2, 2004, Wilhoit substantiated the alleged misconduct by Hughes and found that Hughes's conduct violated Patrol policies. Wilhoit was assigned to investigate Hughes's misconduct by his supervising officer. As part of the investigation, Wilhoit questioned Hughes and Hughes admitted the basic facts underlying the misconduct charge, although he believed his conduct was justified.

### b. Children

After the Patrol initiated its investigation of Hughes regarding the coyote shooting incident, Fisher felt compelled to report other misconduct by Hughes and this conduct formed the basis for the remaining three disciplinary complaints against Hughes.

On February 11, 2004, Ripley signed another complaint against Hughes. In his complaint, Ripley alleged that Hughes instructed one of the troopers that he supervised to pick up Hughes's children from school while the trooper was on duty and transport Hughes's children in a patrol car to Hughes's residence. Ripley alleged that this occurred three to four times between July 2001 and August 2003.

Wilhoit conducted the investigation into Hughes's conduct and Hughes admitted that he had ordered the trooper to pick up his children from school on at least two occasions. Hughes also admitted during the interview that he had used his Patrol vehicle to transport his children to and from school in the past. In a report dated February 13, 2004, Wilhoit found that the complaint was substantiated and that Hughes's conduct violated Patrol policies.

8

On February 23, 2004, Ripley signed another complaint against Hughes for misconduct that occurred in July 2003.  In his complaint, Ripley alleged that Senator Harold Caskey contacted Hughes and directed him to obtain a set of license plates from a private vehicle that was impounded in a private tow lot.  The license plates belonged to one of Senator Caskey's constituents and the vehicle with the plates had been involved in a car accident in Butler, Missouri.  Hughes directed a subordinate trooper to go to the tow lot and obtain the license plates; the trooper complied and delivered the plates to Senator Caskey's law office.  The owner of the tow lot protested the confiscation of the plates because he had not been paid for his towing services and he contacted Hughes directly.

Wilhoit conducted the investigation into Hughes's conduct.  On March 16 and 18, Wilhoit interviewed several witnesses regarding the incident, including Hughes.  Wilhoit also interviewed the owner of the tow lot and he stated that Hughes was very rude to him during their two conversations and advised him that he should know better than "to mess with Senator Caskey."  The owner of the tow lot also stated that Hughes threatened to prevent this particular tow company from towing for the Patrol.  According to the tow lot owner, Hughes hung up on him and the tow lot owner felt that Hughes used an intimidating tone.

Wilhoit also interviewed the trooper who obtained the plates and he verified that Hughes had instructed him to obtain them.  During Wilhoit's interview with Hughes, Hughes admitted to the underlying conduct, but he disputed the tow lot owner's version of

9

their conversations.  In a report dated March 29, 2004, Wilhoit found that the complaint was substantiated.

### 3.    *Disciplinary Complaint Signed by Ellis*

On March 22, 2004, Ellis signed a disciplinary complaint against Hughes for entering Fisher's home without Fisher's permission while no one was at Fisher's home.[1] The complaint alleged that Hughes used Fisher's garage door pass code to enter Fisher's home and that Hughes searched Fisher's home for the spare key for Fisher's patrol car. After Hughes found the spare key, he drove Fisher's patrol car to the scene of an accident because his patrol car was damaged.  Fisher approached his superiors after learning of Hughes's conduct and levied a complaint against Hughes and Ellis signed the formal complaint.  Ellis signed the disciplinary complaint pursuant to the same Patrol policy that dictated Ripley sign the earlier three disciplinary complaints.

Wilhoit investigated the complaint that was signed by Ellis.  As part of his investigation, Wilhoit interviewed Hughes and Hughes admitted the underlying conduct, although he claimed that he was justified in entering Fisher's home.

Wilhoit investigated the complaint against Hughes in his role as an investigator with the Professional Standards Division of the Patrol.  In a report dated April 12, 2004, Wilhoit substantiated the facts underlying the disciplinary complaint.  The evidence reflects that

---

[1]Wilhoit's report indicates that Ripley initiated the complaint, but the actual complaint reflects that Ellis signed it.  In their briefs, the parties do not dispute that Ellis was the party that actually signed the complaint against Hughes.

10

Wilhoit was assigned to investigate the complaint against Hughes by his supervisor.

### 4. *Wilhoit's Investigations*

Hughes alleges that the commencement of the four disciplinary complaints against him was retaliatory. Moreover, Hughes alleges that Wilhoit's subsequent investigations into those complaints were also retaliatory. In his brief, Hughes implies that Wilhoit conspired with Ellis and Ripley to tarnish his reputation because Wilhoit knew Ripley from the Patrol academy.

### 5. *Narcotics Officer Application*

Hughes alleges that he applied for a position as a Narcotics Officer with the Patrol in March 2004. During Hughes's interview in April 2004, the interviewer asked Hughes whether there were any complaints pending against him and Hughes revealed the complaints and explained that the investigation was ongoing. Hughes did not receive the job and now alleges that his denial of the position was an adverse employment action that was the consequence of Defendants' allegedly retaliatory conduct.

### 6. *Scheduling Issues*

Hughes argues that Ripley imposed certain scheduling requirements on him that he did not impose on other sergeants. Specifically, Hughes alleges that Ripley thought Hughes was scheduling himself to be off work on too many Sundays and Wednesdays. As a result, Ripley began requiring that Hughes clear any of his personal schedule changes with Ripley, which was not a requirement for other sergeants under Ripley's supervision.

### 7. *Training Session*

11

Hughes argues that Ripley improperly docked him 3.5 hours of compensatory time for a training session that occurred in August 2003. Ripley docked Hughes because Hughes did not wear his uniform to the training session. Hughes alleges that it was permissible not to be in uniform and that another Patrol employee was not in uniform during the training session.

### 8.    *Hughes's Demotion and Transfer*

After Wilhoit substantiated the four disciplinary complaints against Hughes, Stottlemyre convened a meeting of his staff in May 2004 to decide what discipline to impose on Hughes. Wilhoit, Ellis, and Ripley all attended the meeting in their respective roles as investigators and Hughes's superiors. Stottlemyre did not solicit the opinions of Wilhoit and Ripley regarding what Hughes's punishment should be, but Ellis did offer an opinion that Hughes should be terminated from the Patrol. All of the attendees at the meeting except one advised that the Patrol should terminate Hughes's employment based on the admitted misconduct. Stottlemyre tentatively decided to terminate Hughes's employment.

After giving additional thought to the matter, Stottlemyre unilaterally decided the next day to demote and transfer Hughes instead of terminating him. Stottlemyre, in his capacity as the Patrol's highest-ranking officer, retains ultimate discretion over disciplinary decisions. Stottlemyre states in his affidavit that the three disciplinary complaints signed by Ripley were sufficient to warrant demoting and transferring Hughes.

In accordance with Stottlemyre's decision, the Patrol demoted Hughes to a trooper

12

position and transferred him to the Gaming Division. It does not appear that Hughes is claiming that Stottlemyre violated his rights by demoting and transferring him because Hughes sues Stottlemyre in his official capacity and seeks only prospective injunctive relief. Pl.'s Sugg. in Opp. to Def.'s Mot. for Summ. J. at 44. He does not allege any personal misconduct on the part of Stottlemyre.[2]

### D. Hughes's Complaint

Hughes filed his initial Complaint on March 25, 2004. Hughes filed his Amended Complaint on May 11, 2004, wherein he added Ellis as a defendant. Hughes's Amended Complaint contains one count in which he alleges that Defendants violated his constitutional rights by retaliating against him for opposing the consolidation plan. Hughes names Ellis, Ripley, and Wilhoit in their official and individual capacities and alleges they committed the retaliatory misconduct. Hughes does not allege that Stottlemyre engaged in misconduct and he sues Stottlemyre only in his official capacity for injunctive relief. Hughes does suggest that his demotion and transfer by Stottlemyre were caused by the disciplinary actions which were initiated by the defendants who are sued in their individual capacity.

### II. Discussion

To succeed on his First Amendment retaliation claim, Hughes must show (1) that he engaged in protected activity; (2) the government official took adverse action against him;

---

[2]Even in his proposed amendment to his Complaint, Hughes does not allege that Stottlemyre personally retaliated against him.

13

and (3) the protected activity was a substantial or motivating factor that led to the adverse employment action. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *Ingram v. Johnson*, 187 F.3d 877 (8th Cir. 1999). After a public employee satisfies the initial burden of making out a *prima facie* case, the burden shifts to the public employer to show a legitimate, non-retaliatory reason for the adverse employment action. *Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir. 2002) (citing *Graning v. Sherburne County*, 172 F.3d 611, 615 (8th Cir. 1999)) (applying the burden-shifting test in the First Amendment retaliation context). If the employer meets this burden, then the burden shifts back to the employee to show that the employer's offered reason is pretextual. *Id.*[3]

### A.     Protected Activity

Defendants argue that Hughes's statements concerning the consolidation plan did not constitute protected activity because Hughes was speaking on a personal matter that did not implicate a public concern.

Defendants are correct that not all speech by a public employee constitutes protected activity. *Belk v. City of Eldon*, 228 F.3d 872, 879 (8th Cir. 2000). Courts hold that, "[w]hen a public employee's speech is purely job-related, that speech will not be deemed a matter of public concern . . . . Unless the employee is speaking as a concerned

---

[3]The Court of Appeals for the Eighth Circuit has held that this burden-shifting framework is still applicable at the summary judgment stage and that the framework was unaffected by the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003). *See Torlowei v. Target*, 401 F.3d 933, 934 (8th Cir. 2005) (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004)).

14

citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." *Id.* (citing *Buazard v. Meridith*, 172 F.3d 546, 548 (8th Cir. 1999)).

To constitute protected activity, the speech at issue must relate to "a matter of public concern." *Sparr v. Ward*, 306 F.3d 589, 594 (8th Cir. 2002) (citing *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684 (1983)). To qualify as a matter of public concern, the issue must be "a matter of political, social, or other concern to the community" and courts look to the content, form and context of the speech, as revealed by the whole record, to determine whether it is a matter of public concern. *Id.* Complaints to superiors or private communications with an employer about matters of public concern are protected activity. *Campbell v. Arkansas Dep't of Correction*, 155 F.3d 950, 959 (8th Cir. 1998). Whether speech constitutes a public concern is a matter of law for a court to decide. *Sparr*, 306 F.3d at 594.

The undisputed evidence reflects that when Hughes objected to the consolidation plan during the June 2003 meeting, he raised a number of issues that he viewed as potential problems, including whether there would be enough Patrol coverage for Bates County. Hughes expressed his belief that the consolidation plan would be a disservice to Bates County and harm Patrol coverage in that area. Although Hughes's objection may have been motivated, in part, by personal concerns, it is also clear that he was motivated by a concern that the plan would be a disservice to Bates County and its citizens. Thus, the content of Hughes's speech weighs in favor of finding that he was speaking on a matter of public concern.

15

Similarly, the context and form of Hughes's speech demonstrates that it touched on a matter of public concern. Hughes's comments were during a meeting with his supervisors and co-worker to discuss the consolidation plan and they were in the form of a presentation by Hughes in which he relied on data that he compiled regarding accident statistics in Bates County. Hughes's speech was not a private conversation or off-the-cuff comments; instead, it was a prepared presentation that was communicated directly to the supervisors that are accused of the retaliation. Because Hughes's conduct implicated public policy concerns for citizens of Bates County and it was delivered during a meeting with his supervisors, the Court finds that Hughes's speech was protected activity.

### B.      Adverse Action

To constitute an adverse employment action, the wrongful conduct must "have an adverse impact on the employee and must effectuate 'a material change in the terms or conditions of . . . employment.' Stated another way, 'proof of an adverse employment action requires a tangible change in duties or working conditions that constitute a material disadvantage.'" *Jones v. Fitzgerald*, 285 F.3d 705, 713 (8th Cir. 2002) (internal citations omitted). Examples of material disadvantages that may constitute an adverse employment action include a detrimental change in salary, benefits, or responsibilities. *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003). Actions short of termination may constitute an adverse employment action, but "'not everything that makes an employee unhappy is an actionable adverse action.'" *Id.* (citations omitted).

In his brief, Hughes offers over thirty incidents that he claims demonstrate adverse

16

action by his superiors.  Many of the incidents in Hughes's brief do not contain a citation to the record or they are so patently unsupported in the law that they do not warrant a detailed discussion about whether they rise to the level of adverse action.  Thus, the Court will focus on those incidents that did affect, or may have affected, the actual terms and conditions of Hughes's employment.

### 1.  *Evaluations*

#### a.  **Hughes's Evaluations**

Hughes alleges that his October 2003 evaluation was an adverse employment action.  However, a comparison of that evaluation with Hughes's evaluations before he engaged in protected activity demonstrates that they are substantially similar in that Ripley evaluated Hughes's performance as being between "Meets Expectations" and "Excels" in all the categories in all of the evaluations.  Although Hughes's October 2003 evaluation may contain some more pointed critiques of his performance, there is no evidence that these comments are significantly inconsistent with the evaluations conducted before the consolidation meeting; particularly, the evaluation in October 2002, which also had some negative comments regarding Hughes's performance.

Nonetheless, even assuming that the evaluations, which were done after the consolidation meeting, were substantially more negative than Hughes's previous evaluations, there is no evidence that they had any impact on his demotion, his failure to get the narcotics position, or the loss of 3.5 hours of compensatory time.  The Eighth Circuit holds that a poor performance rating or an unfavorable evaluation are "actionable only

17

where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears v. Missouri Dep't of Corrections and Human Resources*, 210 F.3d 850, 854 (8th Cir. 2000) (citations omitted). *See also Jones*, 285 F.3d at 714 (presence of a negative memoranda in a personnel file, without more, does not constitute adverse action). *See also LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 692 (8th Cir. 2001) ("[A] negative review is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment ."). It is not enough if an unfavorable evaluation merely "demeans" a plaintiff in the eyes of the plaintiff's co-workers. *Spears*, 210 F.3d at 854.

Stottlemyre did not rely on Hughes's October 2003 evaluation in reaching his decision to demote and transfer Hughes. Equally important, there is no evidence that Ripley and Ellis relied on the evaluation in reaching their decision to submit the administrative complaints against Hughes. Nor is there evidence that Hughes did not get the narcotics position because of the evaluation. Because the October 2003 evaluation did not as a matter of law have any impact on subsequent adverse actions, it does not constitute an independent, adverse employment action.

b.      **Troopers' Evaluations of Sergeants**

Hughes also alleges that Ripley's policy of having subordinate Patrol employees evaluate their sergeants was somehow retaliatory in nature against Hughes. This policy does not constitute an adverse employment action because it did not materially change

18

Hughes's working conditions. *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003). Furthermore, even if it were an adverse employment action, the evidence reflects that Ripley instituted this policy with respect to all of the sergeants under his command--not just Hughes. Employment policies that are equally and neutrally applied to all employees cannot give rise to an inference of wrongful animus. *Smith v. Monsanto Chemical Co.*, 770 F.2d 719 (8th Cir. 1985) (uniform application of termination policy could not be basis for an adverse employment action); *Shaner v. Synthes*, 204 F.3d 494 (3rd Cir. 2000) (gender-neutral application of employment policy did not give rise to discriminatory inference in Title VII context) (citations omitted). Therefore, because Ripley applied the new evaluation policy to all of the sergeants under his supervision, a reasonable jury cannot find that the new policy was instituted in retaliation for Hughes's speech.

### 2. *Disciplinary Complaints*

Hughes argues that the four disciplinary complaints signed by Ripley and Ellis also constitute adverse employment action that injured his constitutional rights. Although the complaints themselves did not constitute a change in the material terms of Hughes's employment, they did culminate in Hughes's demotion and transfer. Thus, according to Hughes's theory, Ripley's and Ellis's complaints were the catalyst for the demotion and transfer that was later implemented by Stottlemyre.

In the context of First Amendment retaliation cases, filing a disciplinary complaint against an employee can constitute adverse employment action that is actionable if the

19

disciplinary complaint sets in motion a "series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injuries . . . ." *Graves v. Arkansas Dep't of Finance & Admin.*, 229 F.3d 721, 723 (8th Cir. 2000); *Darnell v. Ford*, 903 F.2d 556, 562 (8th Cir. 1990). Hughes alleges that Ripley's and Ellis's complaints set in motion Stottlemyre's conduct and, in this respect, they culminated in an actionable adverse employment action. Therefore, the disciplinary complaints signed by Ripley and Ellis that led to Hughes's ultimate demotion and transfer can constitute an adverse employment action, viewing the evidence in the light most favorable to Hughes.

### 3. Wilhoit's Investigation

Similarly, Hughes alleged that Wilhoit's investigation of Hughes's conduct constitutes adverse employment action because it culminated in Stottlemyre's adverse action against Hughes. Because Wilhoit's conduct is not inherently an adverse action, it can only be an adverse employment action if it culminated in Stottlemyre's decision to demote and transfer Hughes. Because Wilhoit's investigation was a necessary link between the complaints and Hughes's demotion, the Court will assume that it is an adverse action.

### 4. Scheduling Issues

The scheduling requirements that Ripley imposed on Hughes do not constitute an adverse employment action because there is no evidence to show that this change materially affected a term of Hughes's employment. To constitute an adverse employment action, the action must be more than "minor changes in duties or working conditions." *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004).

20

Moreover, a change in an employee's working conditions that merely makes the employee unhappy or disappointed cannot constitute an adverse action. *Saulsberry v. St. Mary's Univ. of Minnesota*, 318 F.3d 862, 868 (8th Cir. 2003).

Although Hughes may have been disappointed by Ripley's oversight of his schedule, that is not sufficient because the supervision was merely a "minor" shift in his working conditions. *Henthorn*, 359 F.3d at 1028. Ripley's supervision of Hughes's schedule did not alter any tangible benefit of Hughes's job nor did it substantially alter his schedule.

### 5.    *Training Session*

Hughes's allegation that he was improperly docked 3.5 hours of compensatory time does qualify as an adverse employment action. If an employment policy results in a "detrimental change in salary, benefits, or responsibilities" then it can constitute an adverse employment action. *Tademe*, 328 F.3d at 992. Compensatory time is a tangible benefit. Therefore, denial of that compensatory time is a "material change in terms or conditions of employment" and qualifies as an adverse employment action. *Jones*, 285 F.3d at 713.

### 6.    *Narcotics Division Application*

Failing to promote an employee is an adverse employment action. *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830 (8th Cir. 2002).

### C.    Causation

Based on the foregoing, the following activities are adverse employment actions: (1) four disciplinary complaints signed by Ripley and Ellis, which allegedly resulted in Stottlemyre's decision to demote and transfer Hughes; (2) Wilhoit's investigation and

21

substantiation of the four disciplinary complaints; (3) loss of 3.5 hours in compensatory time for not wearing his uniform; and (4) the denial of Hughes's transfer to the narcotics division. The next question is whether Hughes has presented sufficient evidence to make a *prima facie* case of causation; i.e., that these adverse actions were motivated by a retaliatory animus.

### 1. Training Session

Hughes claims that he lost 3.5 hours in compensatory time because of the statements he made concerning the consolidation of the Highway Patrol staff in Bates and Cass Counties. Hughes offers only his deposition to support his claims regarding the training session and the penalty for not wearing his uniform. In his deposition, Hughes states that another Patrol employee was not in uniform and that "[t]o my knowledge, his pay wasn't docked." (Hughes Tr. 108:4.) Under further questioning, Hughes admitted that he did not know for sure whether the other employee's pay was docked and he admitted that he did not inquire about the other employee's compensatory time. Moreover, Hughes alleged that it was permissible to not be in uniform during training sessions, but he did not offer any evidence or policy to support his claim. Instead, Hughes relied on the conclusory statements in his deposition.

Hughes cannot specifically point to any other employee who did not wear a uniform to the training and was not docked the compensatory time. Moreover, Hughes does not offer any Patrol policy or directive that states it is permissible not to be in uniform during a training session. Hughes's entire allegation surrounding the training session relies solely

22

on his own conclusory statements unsupported by admissible evidence. Conclusory statements by a plaintiff are not sufficient to make a submissible case. *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 683-84 (8th Cir. 2001); *Jeseritz v. Potter*, 282 F.3d 542, 547 (8th Cir. 2002); *Miller v. Citizens Sec. Group, Inc.*, 116 F.3d 343, 346 (8th Cir. 1997). Thus, the Court finds that a reasonable fact finder could not infer a causal nexus between Hughes's protected activity and the training session incident.

### 2. Denial of Transfer to Narcotics Division

Hughes has not presented any evidence that any of Defendants were involved in the Patrol's decision not to accept his application for a position in the narcotics division. Moreover, Hughes has not presented any evidence that the individuals who rejected his application for the narcotics position knew about his protected activity. Where different decision-makers were involved in an adverse action, there is no basis for finding liability, particularly if the decision-maker had no knowledge about underlying protected activity. *Eley v. United States Dep't of Veterans Affairs*, No. 03-2782, 2004 WL 768671 (8th Cir. Apr. 9, 2004); *TRI, Inc. v. Boise Cascade Office Products, Inc.*, 315 F.3d 915, 919 (8th Cir. 2003); *cert denied,* 539 U.S. 960 (2003). It appears that Hughes is arguing that the disciplinary complaints filed by Ripley and Ellis caused him not to get the promotion, but Hughes does not present any evidence to support his argument beyond his own speculation. Hughes's argument is based on conjecture and not on evidence contained in the record. Therefore, a reasonable juror could not conclude that Hughes failed to get the narcotics position because of his statements concerning the consolidation plan.

23

### 3.    *Disciplinary Complaints and Investigations*

For purposes of this Motion, the Court will assume without deciding, that Hughes has made a *prima facie* case that the disciplinary complaints and investigations were causally linked to his statements concerning the consolidation plan.  This assumption is based only on the evidence which supports Hughes's claim.  The Court next turns to the remaining steps in the *McDonnell Douglas* framework.

### D.    **Legitimate, Non-Retaliatory Reasons**

The next question is whether the Defendants have provided evidence of a legitimate, non-retaliatory reason for the disciplinary complaints against Hughes and the ensuing investigations.

The Eighth Circuit holds that employers may demonstrate legitimate, non-retaliatory reasons for adverse employment actions in a variety of ways.  If an employer's adverse employment action derives from a violation of an employer's policy, then the employer can satisfy the legitimate, non-retaliatory prong of the burden-shifting framework.  *See Grey v. City of Oak Grove, Missouri*, 396 F.3d 1031, 1035 (8th Cir. 2005) (violation of city personnel policies was a legitimate, non-retaliatory reason); *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 989 (8th Cir. 1999) (violation of company lunch policy was a legitimate, non-retaliatory reason).  Not surprisingly, where an employee admits the factual circumstance underlying the adverse employment action, then the employer has a legitimate, non-retaliatory reason for taking the adverse action.  *Stuart v. General Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000).

24

The Defendants have submitted evidence of a legitimate, non-retaliatory reason for the disciplinary complaints against Hughes. Fisher presented his concerns about Hughes to Ripley and Ellis and they, in turn, timely signed the complaints in accordance with Patrol policy that required their signature and forwarded them to the Professional Standards Division. In the complaints, Defendants alleged that Hughes violated Patrol policy on a number of occasions, which can be the basis for a legitimate, non-retaliatory reason for their conduct. *See Grey*, 396 F.3d at 1035.

Similarly, Wilhoit has submitted evidence that he had a legitimate, non-retaliatory reason for investigating the disciplinary complaints and ultimately substantiating them. Wilhoit investigated the complaints as part of his job duties with the Professional Standards Division and he did not seek out an assignment to Hughes's case; instead, he was involuntarily assigned by his supervisor to Hughes's case. When Wilhoit interviewed Hughes about the complaints, Hughes admitted the underlying conduct. As previously stated, when an employee admits the underlying conduct, there is evidence of a legitimate, non-retaliatory reason for the discipline. *Stuart*, 217 F.3d at 634.

## E. Pretext

Because Defendants have provided evidence of legitimate, non-retaliatory reasons for their conduct, the burden of production shifts back to Hughes to demonstrate that these reasons were pretext for Defendants' true retaliatory animus. For a plaintiff to establish the plaintiff's *prima facie* case, the plaintiff must offer only minimal evidence. *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004); *Sprenger v. Fed. Home Loan*

25

*Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001). However, in the pretext stage

of a court's analysis, a plaintiff must provide substantial evidence of pretext in order to

defeat a dispositive motion. *Cherry*, 361 F.3d at 479 (emphasis added); *Sprenger*, 253

F.3d at 1111 (emphasis added). Courts impose this higher standard at the pretext stage

because the evidence is now viewed in light of the employer's justification for the adverse

employment action. *Sprenger*, 253 F.3d at 1111.

### 1. *Disciplinary Complaints by Ripley and Ellis*

#### a. **Similarly Situated Employees**

Hughes claims that employees similarly situated to him were treated differently and

this is sufficient to establish pretext. *See Graves v. Arkansas Dep't of Finance & Admin.*,

229 F.3d 721, 723 (8th Cir. 2000); *Darnell v. Ford*, 903 F.2d 556, 562 (8th Cir. 1990).

To be similarly situated to the plaintiff, the employee in question "must have dealt with the

same supervisor, have been subject to the same standards, and engaged in the same conduct

without any mitigating or distinguishing circumstances." *Tolen v. Ashcroft*, 377 F.3d 879,

882 (8th Cir. 2004) (citations omitted).

In *Graves* and *Darnell*, the court held that the circumstances of the disciplinary

complaints may give rise to an inference of pretext because both cases contained evidence

that the officer who complained about the plaintiff's conduct had ignored similar conduct

by other officers and singled out the plaintiff for disciplinary treatment. Hughes, however,

does not offer any similarly situated employees who were treated differently than he was.

Although Hughes attempts to submit information regarding similarly situated employees,

26

closer scrutiny reveals that these employees are not comparable to Hughes. Hughes first argues that Ripley ignored the negative comments on the evaluations that Davidson's subordinates wrote and, because Ripley ignored the comments, then he must have retaliatory animus against Hughes. Hughes's argument is misplaced. First, the undisputed catalyst for Ripley initiating the three disciplinary complaints against Hughes was Fisher's complaints about Hughes--not the negative comments contained in Hughes's subordinate evaluations. Second, there is no evidence that any subordinate ever presented specific, particular complaints about Davidson's misconduct with the Patrol. The comments on Davidson's evaluations are negative, but they do not allege specific instances of misconduct that are in clear violation of Patrol policies; instead, they are generalized comments about Davidson's management and leadership style. Thus, because there is no evidence that one of Davidson's subordinates submitted specific complaints about Davidson above and beyond the generalized comments in his evaluations, Hughes and Davidson are not similarly situated employees.

Hughes also offers the discipline records of several employees within the Patrol who allegedly engaged in the same conduct as Hughes and were not demoted and transferred. Again, Hughes's argument misses the mark. Several of the employees are different ranks than Hughes; thus, they are facially not similarly situated. Also, none of the employees were under the supervision of Ripley or Ellis. The only nexus between Hughes and these employees is that Stottlemyre imposed the discipline in all the cases, but Hughes does not allege any misconduct on the part of Stottlemyre. Hughes's submission of

27

disciplinary records of employees who were not supervised by Ripley or Ellis cannot give rise to an inference of pretext against those Defendants.

Hughes has not presented any evidence that Ripley or Ellis knew about comparable conduct by other employees under their supervision and ignored it. Hughes's failure to submit such evidence of similarly situated employees defeats his claim of pretext and a reasonable fact finder could not find in favor of Hughes on this issue.

In addition to submitting evidence regarding similarly situated employees, the plaintiffs in *Graves* and *Darnell* involved situations where the complaining officer was instigating the complaint and the complaining officer had knowledge of the plaintiff's misconduct prior to the protected activity and chose not to report it until after the plaintiff engaged in the protected activity. Hughes fails to submit any evidence that Ripley or Ellis knew about his misconduct prior to his protected activity and did not report it. Fisher began reporting Hughes's misconduct in early 2004 and the disciplinary complaints were submitted shortly thereafter.

Hughes also fails to submit any evidence to rebut Defendants' assertion that Fisher was the officer who instigated the misconduct complaints against Hughes. Although Ripley and Ellis signed the complaints, they signed the complaints in accordance with the Patrol's policies and in response to Fisher's complaints.

Because Hughes has failed to offer evidence of similarly situated employees, a reasonable fact finder could not infer that Defendants' conduct was pretext for their retaliatory animus against Hughes.

28

### b. Temporal Proximity

The temporal proximity of the disciplinary complaints also refutes Hughes's

assertion of pretext. Although temporal proximity is not dispositive of whether there is an

inference of pretext, it is a factor that courts consider. In this case, the alleged retaliatory

activity did not occur until six months after Hughes engaged in his protected activity. The

meeting about the consolidation plan occurred in June 2003 and the first disciplinary

complaint was not signed by Ripley until January 14, 2004. Courts hold that a time interval

between the protected activity and the adverse action greater than a few months cannot give

rise to an inference of retaliation. *See Eley v. U.S. Dep't of Veterans Affairs*, No. 03-

2782, 2004 WL 768671 (8th Cir. Apr. 9, 2004) (interval of four months between protected

activity and adverse action); *Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 616

(8th Cir. 2003) (interval of two months between protected activity and adverse action);

*Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 896-97 (8th Cir. 2002)

(interval of two months between protected activity and adverse action). Therefore, a

reasonable fact finder could not infer pretext because of the six-month interval between the

first disciplinary complaint and his protected activity.

### c. October 2003 Evaluation

Similarly, Hughes cannot rely on his October 2003 evaluation as evidence of pretext

because his October 2003 evaluation was not materially different from his previous

evaluations. These minor differences cannot give rise to an inference that Ripley intended

to retaliate against Hughes for his opposition to the consolidation plan. Hughes's overall

29

scores in October 2003 were very consistent with his previous evaluations, although the comments section did contain more pointed critiques. Such comments, particularly where they did not form the basis for a subsequent adverse employment action and they occurred four months after the protected activity, cannot give rise to an inference of retaliation.

### 2. Wilhoit's Investigation

Hughes cannot provide substantial evidence that would cause a reasonable fact finder to infer that Wilhoit's legitimate, non-retaliatory reasons for his actions are pretextual. There is no evidence that Wilhoit had any knowledge of Hughes's protected activity until Hughes filed his Complaint on March 25, 2004.[4] Hughes attempts to establish that Wilhoit had knowledge of the protected activity prior to March 25 but he does not offer any evidence in the record; instead, he implies that Wilhoit conspired with Ripley and Ellis because Wilhoit attended the Patrol academy with Ripley. Because of their past relationship, according to Hughes's theory, Ripley must have told Wilhoit about his protected activity and conspired with Wilhoit to act against Hughes. This argument is based on Hughes's conjecture and there is no evidence in the record to support it. Therefore, the Court will treat March 25, 2004, as the date that Wilhoit received knowledge about Hughes's protected activity.

Before March 25, 2004, Wilhoit had already substantiated the first two disciplinary

_____

[4]Wilhoit argues he did not have knowledge of the alleged protected activity until he responded to Hughes's interrogatories during the course of discovery. However, viewing the evidence in the light most favorable to Hughes, the Court finds that Hughes's Complaint on March 25, 2004, put Wilhoit on notice of Hughes's alleged protected activity.

complaints against Hughes--the highway shooting by Mullenix and the order by Hughes to a subordinate to transport Hughes's children. The former was substantiated in a report dated March 2, 2004, and the latter was substantiated in a report dated February 13, 2004. Thus, Wilhoit's conduct in relation to these two complaints cannot give rise to an inference of pretext.

The third disciplinary complaint regarding the license plates from the tow lot was not substantiated until March 29, 2004--four days after Hughes filed his Complaint and Wilhoit gained knowledge of Hughes's protected activity. However, the record reveals that Wilhoit had already interviewed several witnesses prior to March 25, 2004, and that the investigation was already well under way when Hughes filed his Complaint. Thus, Wilhoit's commencement of the investigation cannot give rise to an inference of pretext because he did not have knowledge of the protected activity at the time this investigation was commenced.

The fourth complaint regarding Hughes entering Fisher's home was filed on March 22, 2004--three days before Hughes filed his Complaint. Although Wilhoit did not interview the witnesses or file his report substantiating the complaint until after Hughes filed his Complaint on March 25, the evidence reflects that Wilhoit had already been assigned to investigate the matter by that time. In retrospect, it may have been imprudent for Wilhoit's supervisors to keep him assigned to Hughes's case after Hughes filed his Complaint, but that fact does not create a basis for imputing retaliatory motive to Wilhoit as an individual.

Case 2:04-cv-04053-NKL   Document 69   Filed 05/27/05   Page 31 of 33

For the foregoing reasons, the timing of Wilhoit's investigations cannot support an inference of retaliatory pretext by Wilhoit. When Hughes filed his Complaint on March 25, the evidence reflects that Wilhoit had concluded the first two investigations, was substantially finished with the third investigation, and had already been assigned to the final investigation.

Wilhoit's findings regarding the disciplinary complaints might be more suspect if Hughes had not admitted the underlying conduct that was the basis for all four of the complaints. However, because Hughes admitted the conduct, Wilhoit was not forced to make a credibility determination about Hughes nor did he have to weigh competing factual scenarios. Instead, Wilhoit had to determine if the underlying conduct violated Patrol policies. Wilhoit believed it did and Stottlemyre's subsequent disciplinary action against Hughes reinforces that Wilhoit's position was consistent with the Patrol's views. No reasonable juror could conclude on this record that Hughes's conduct was not a violation of Patrol policies.

The Court acknowledges that Hughes believes his conduct regarding each disciplinary complaint was somehow justified, but that is not an issue for this Court to decide because courts do not sit as "super-personnel departments to resolve such disagreements." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 2005 WL 850893 at *4 (8th Cir. Apr. 14, 2005) (federal courts do not have "authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.")

32

(quoting *Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004)). Moreover, it is not unlawful for employers to make employment decisions based on erroneous evaluations or information, as long as the decisions are not motivated by retaliatory animus. *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 957 (8th Cir. 2001). Thus, instead of focusing on whether Hughes's conduct was justified and the Patrol's decisions were erroneous, the inquiry before this Court is whether there is sufficient evidence to demonstrate a retaliatory pretext. Hughes has failed to aver such evidence and a reasonable trier of fact could not infer one.

## III.  Conclusion

Accordingly, it is hereby

(1)     ORDERED that Defendants' Motion for Summary Judgment [Doc. # 44] is GRANTED;

(2)     ORDERED that Roger D. Stottlemyre's individual Motion for Summary Judgment [Doc. # 42] is DENIED as moot; and

(3)     ORDERED that Plaintiff's Motion to Strike [Doc. # 49] is DENIED as moot; and

(4)     ORDERED that Plaintiff's Motion to Amend [Doc. # 67] is DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

DATED:  May 27, 2005
Jefferson City, Missouri

33